GORDON BIGHAM V. THE STATE.

No. 21364. Delivered February 12, 1941.
Rehearing Denied March 19, 1941.

The opinion states the case.

*T. D. Kimbrough,* of Midland, and *C. C. McDonald,* of Wichita Falls, for appellant.

*Gerald Mann,* Attorney General of Texas, *Benjamin Woodall* and *Pat Coon,* Assistant Attorneys General, *Martelle McDonald,* District Attorney, of Big Spring, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was charged with accepting a bribe, and by the jury given a penalty of two years in the penitentiary.

The facts proven by the State show that appellant was a deputy supervisor of the oil and gas department of the Railroad Commission, and as such was stationed in the area embraced by the Iatan East Howard County field. R. J. Kelly was vice-president of the Shasta Oil Company, and was a resident

of Midland County, in which area such company owned a large number of producing oil wells.. These wells, under the rules and regulations of the Commission, had a certain allowable which was based to some extent on the possible amount of oil that could be produced from each well, called its potential. From time to time, if desired or necessary, it was the province of this deputy supervisor to make a test of these wells to see how much oil they could produce in a given time in order to allow the Commission to fix the amount of oil that such wells would be allowed to produce. It seems that such wells of the Shasta Oil Company were operating under an allowable that was satisfactory to the owners at the time laid in the indictment. However an interview was had between Mr. Kelly and appellant in which, as the State contends, appellant indicated that he thought the potential of these wells had decreased, and therefore that they were being allowed to produce more oil than they were entitled to produce under the rules and regulations of the Commission, and that the appellant intended to make another test of their possible ability to produce oil and report the same to the Commission, and they would thus probably reduce the allowable on said wells, and might possibly cause such wells to cease production for a certain period because of their past over-production.

At such meeting between appellant and Kelly appellant demanded the sum of $5,000.00 in cash and a payment of $200.00 per month in return for an agreement that he, appellant, would not make a further test of the said wells, but would allow them to continue to produce on their present allowable. Mr. Kelly got in touch with the president of the oil company and the Attorney General's Department, and made an appointment to meet appellant in Midland on a certain date. The representatives of the Attorney General, a Federal agent and two State Rangers repaired to Midland and placed dictaphones in the office of Mr. Kelly; and on the date set appellant appeared at Mr. Kelly's office. A stenographer had been placed in the next room to Kelly's office and, through earphones, heard the conversation and took the same down in shorthand, and transcribed her notes, which were afterwards introduced in evidence.

After this conversation the appellant left Kelly's office, and was immediately arrested by the Rangers, and there was found on his person two hundred and fifty $20.00 bills, which were identified by their numbers as certain moneys furnished to Mr. Kelly prior to the interview between him and appellant.

. Appellant's bill of exceptions No. 1 relates to his motion to

quash the first count of the indictment, which was the only count submitted to the jury, and upon which the conviction was based. This count is set forth in three pages of typewritten matter and is long and involved, and in the interest of brevity we will not copy the same in this opinion. Suffice it to say, the same sets forth the fact that appellant was the duly appointed and acting Deputy Supervisor for the Oil and Gas Division of the Railroad Commission of Texas, engaged in discharging such duties in the Iatan-East Howard oil field in certain counties in the State, and in enforcing the rules and regulations of such Commission therein. Said Commission had made and promulgated certain rules for such field relative to ascertaining the allowable for the wells in such field, and such rules were set forth therein; that it was the duty of appellant as such deputy to make certain tests of the productivity of oil wells in such field in order to carry out the orders and rules of the Commission, and thus allow the Commission to determnie how much oil should be allowed to flow from such wells each day; that appellant did wilfully and corruptly consent to accept and did accept $5,000.00 in money from R. J. Kelly, and did agree not to make any tests of said wells in order to determine the daily allowable of such wells in violation of his duty as such deputy supervisor, etc.

There are twenty exceptions leveled at this indictment, and it is patent that we can not take up and discuss such exceptions seriatim, but must content ourselves with saying that in our opinion the indictment is sufficient to inform the appellant of the offense with which he stands charged. We thus dispose of bill of exceptions No. 1.

Bill of exceptions No. 4 relates to a request for an instructed verdict, which we think was properly overruled, and to the same effect is bill of exceptions No. 5, with the same ruling upon our part.

We do not think that the requested instruction set forth in Bill No. 6 was called for by the evidence presented us, nor does the bill attempt to set forth any such evidence. It is therefore overruled.

Bill No. 7 sets forth a requested charge on circumstantial evidence, and excepts to a failure upon the part of the trial court to give such in charge to the jury. We are not impressed with such a duty herein upon the part of the court; the testi-

mony relative to such matters herein was direct and not circumstantial.

Bill of exceptions No. 8 is concerned with a charge requested by appellant that embodies a doctrine setting forth the difference between an accomplice offender and an accomplice witness. We can see no good reason for the trial court entering into a dissertation before the jury of the different kind or classes of accomplices, nor in what manner a witness becomes such an accomplice. It should be sufficient to say that such a witness was an accomplice, regardless of the route such witness pursued in order to arrive at such accompliceship; and we here note that the court did peremptorily instruct the jury that the witness R. J. Kelly was an accomplice, and also gave a comprehensive charge on the necessity of a corroboration of an accomplice's testimony.

Bill No. 9 complains because the trial court failed to submit to the jury for their decision the fact as to whether or not the witnesses J. R. Lewis and Mrs. R. J. Silberman were accomplices, and if thus found to be by the jury, then the necessity of their testimony being corroborated. We are doubtful as to whether the court should have peremptorily instructed the jury that R. J. Kelly was an accomplice, but if such was an error, it redounded to appellant's benefit, and he does not complain thereof. Relative to the witness J. R. Lewis, the record shows that he was an agent of the Federal government and had naught to do with the commission of any offense, nor its detection other than to be present at Odessa at a conference with the Assistants to the Attorney General, as well as to have flown in an airplane to Midland in company with a large box which presumably contained dictaphones. It is to be further noted, however, that this witness did take down the serial numbers of two hundred and fifty $20.00 bills and identified such a number of bills, supposedly taken off appellant's person, as the same bills whose numbers he had previously taken down. We do not think there is shown in the record any circumstance that would evidence his connection with this transaction in any form than otherwise here indicated. As to the witness Mrs. R. J. Silberman, it is shown by the record that she was a skillful stenographer who for many years had been working for the Shasta Oil Company and Mr. Kelly, and as such stenographer she was told to wait in the room adjoining Mr. Kelly's office and take down any conversation she heard in his office. She did so, and swore that she correctly took down such conversation in shorthand and correctly transcribed her notes, and same was

introduced in evidence. The record shows nothing to intimate that her testimony was that of an accomplice, but was merely that of one who did not seem to know anything about the transaction whatsoever. Mr. Branch says in his Penal Code, p. 360, Sec. 702:

"The witness must be criminally connected with the crime on trial before a charge on accomplice testimony is required," citing many cases.

Bills Nos. 10 and 11 relate to the refusal of a further charge on accomplice testimony setting forth the doctrine that one accomplice can not corroborate another, which charge we do not think called for by the testimony.

Bill of exceptions No. 12 is based on the following occurrence: It will be remembered that the witness Mrs. Silberman testified that she took down in shorthand a conversation between R. J. Kelly and appellant, which occurred at the time the State contended that appellant accepted the bribe of $5,000.00, and that she reduced said notes to typewriting in the English language, and this translation of these notes was introduced without objection before the jury. After the jury had retired, they sent to the trial court this request in writing:

"The jury wishes to know if Mrs. Silberman's transcribed statement is to be considered as corroborative evidence of the witness R. J. Kelly. We also wish to see a copy of same."

After this request was received, appellant requested the court to instruct the jury that they could not consider such transcribed statement as corroborative evidence because the witness Mrs. Silberman was an accomplice. This the court refused to do. Whereupon appellant then requested the court to submit to the jury the proposition as to whether or not the lady was an accomplice witness, which the court again refused to do. To all of which the appellant excepted, and also objected and excepted to the court furnishing to the jury the transcribed notes of Mrs. Silberman as requested by them in writing. We note that the court did not entertain the request of the jury, relative to the effect of Mrs. Silberman's testimony, and made no answer thereto, but that the court did furnish to the jury, as requested by them, the transcribed notes of the alleged conversation between Kelly and appellant. We think the careful trial court was correct in thus answering the request of the jury. It is shown by the bill that the transcribed notes of this conversation were in writing and introduced before the jury,

unobjected to, and marked State's Exhibit No. 4, and as such they were read to the jury. The statute, Art. 674, C. C. P., provides that: "The jury may take with them any writing used as evidence." Also see Branch's P. C., p. 300, Sec. 585. In this case there is no showing that the jury used these transcribed notes in any improper manner. We see no error manifest in said bill.

It is also contended that appellant was indicted under the wrong statute; that he was indicted as an officer of the State, whereas he was merely an employee thereof. That appellant was indicted under the provisions of Art. 159, P. C., seems clear. That article reads as follows:

"Any legislative, executive or judicial officer who shall accept a bribe or consent to accept a bribe under an agreement or with an understanding that his act, vote, opinion or judgment shall be done or given in any particular manner or upon a particular side of any question, cause or proceeding which is or may thereafter by law be brought before him, or that he shall make any particular nomination, appointment, or do any other act or omit to do any act in violation of his duty as an officer, shall be confined in the penitentiary not less than two nor more than ten years."

The court instructed the jury that appellant was such an officer as was contemplated by the above statute.

Art. 160 of the Penal Code reads as follows:

"Under the name of executive, legislative and judicial officers are included governor, lieutenant-governor, comptroller, secretary of state, state treasurer, commissioner of the general land office, commissioner of agriculture, commissioner of insurance, superintendent of public instruction, members of the legislature, aldermen of all incorporated cities and towns, judges of the supreme court, district and county courts and of the courts of appeals, attorney general, district and county attorneys, justices of the peace, mayors and judges of such city courts as may be organized by law, county commissioners, school trustees, and all other city, county and State officials."

It is also noted that it is shown that appellant was a deputy supervisor of the Oil and Gas Division of the Railroad Commission of Texas. In this connection we quote from Art. 6030, R. C. S., as follows:

"The Commission shall employ a Chief Supervisor of its Oil and Gas Division to aid the Commission in the enforcement of

the provision of this Act and all Oil or Gas Conservation Laws of Texas, and all rules, regulations and orders of said Commission made thereunder. He shall also perform the duties placed upon the pipe line expert as set out in the pipe line statutes of this State. The Commission may also appoint a Chief Deputy Supervisor and such other Deputy Supervisors as may be necessary to assist in carrying out the provisions of this Act and related Statutes and shall employ such other assistants and clerical help as may be necessary for the same purpose. The salary of the Chief Supervisor and of Chief Deputy Supervisor and of the Deputy Supervisors shall be fixed by the Legislature in its appropriation bill for the Railroad Commission; provided such salaries shall not exceed the following amounts: That of the Chief Supervisor shall be Six Thousand ($6,000.00) dollars per annum, that of the Chief Deputy Supervisor shall be Five Thousand ($5,000.00) Dollars per annum, and that of the Deputy Supervisors shall be Thirty-six Hundred ($3,600) dollars each per annum. In addition to any other qualifications that may be required by the Commission, no one shall hereafter be appointed Chief Supervisor who has not had at least five years experience in some line of the oil or gas business, or in some other business or profession calculated to fit him for the performance of his duties. No one shall hereafter be appointed as Chief Deputy Supervisor who has not had at least three years experience in oil and gas field work, and no one shall hereafter be appointed deputy supervisor who has not had at least two years experience in oil and gas field work, a substantial portion of which shall be in the drilling or production department. All salaries and other expenses of every kind and character necessary in the administration and enforcement of this Act shall be paid out of the funds created in Chapter 30, Acts of 1917, being now Article 6032. Revised Civil Statutes of 1925, and in the manner therein provided. The Chief Supervisor, Chief Deputy Supervisor and all Deputy Supervisors and all other employees shall perform the duties prescribed by the Railroad Commission and in conformity to the rules and regulations of the Commission dealing with the production, transportation and conservation of crude oil and natural gas."

Also we quote Art. 6031, R. C. S.:

"The supervisor and his deputies shall supervise the plugging of all abandoned wells and the shooting of wells and conform to the rules and regulations of the Commission, dealing with the production and conservation of oil and gas. The super-

visor shall gather information and assist the Commission in the performance of its duties under this title."

It is also worthy of note that Art. 1112b, Vernon's Ann. P. C., under the head of "Bribing Officers," says:

"It shall be unlawful for any person to corruptly give, offer or promise to give any member of the Governmental Agency, Chief Supervisor, Deputy, Supervisor, or any agent or employee thereof, any gift or gratuity with intent to influence any such officer or person in his acts or conduct with respect to:

"(a) Enforcing any provision of the law applicable to oil and gas in force at the time within the State of Texas;

"(b) Enforcing any order, rule, or regulation of the governmental Agency made under the power and authority given to it;

"(c) Or the discharge of any duty by any such officer or person imposed upon him by the oil and gas laws, orders, rules and regulations duly promulgated and in force at such time with the State of Texas." Section 7b.

We early held in the case of State vs. Brooks, 42 Texas, 62, that a deputy sheriff was an officer within the contemplation of the law, and it was again so held in the case of Reed v. State, decided February 5, 1941, our number 20795, not yet reported. (Page 503 of this volume.) It was also held that an assistant director of the Motor Transport Division of the Railroad Commission was either an officer or a de facto officer. Again, we think that Art. 6030, supra, providing for the appointment of a deputy supervisor and prescribing his duties, gives ample grounds for a legal inference that such deputy was an officer in contemplation of this statute. While not a necessary adjunct, nevertheless the fact that a person receives his position by appointment is at least persuasive to some extent that such position is an office; if he receives such merely by employment, the inference might lean toward the fact that he was but an employee. That one is called a deputy carries with it the fact that he is an alter ego for his superior, being charged with all the duties as well as the responsibilities of his superior, and empowered to perform the acts and discharge the duties of such superior, and to that extent becoming the superior officer himself in his superior's absence. If the superior be denominated an officer, then the deputy would also be such an officer.

Reasoning by legislative analogy, we find Art. 161, P. C. reads as follows:

"Whoever shall bribe or offer to bribe, any clerk or other

officer of either branch of the Legislature, or any clerk or employe in any department of the State government, with the intent to influence such officer to make any false entry in any book or record pertaining to his office, or to mutilate or destroy any part of such book or record, or to violate any other duty imposed upon him as an officer, shall be confined in the penitentiary not less than two nor more than five years."

And also it seems to be clear that Art. 162, P. C., seems to classify such governmental employees as "officers" as is shown thereby:

"If any officer named in the preceding article shall accept a bribe so offered, or consent to accept the same, he shall be confined in the penitentiary not less than two nor more than five years."

That the witness Kelly, who was charged as being an accomplice, was not corroborated, is appellant's further contention herein. It is evident from the jury's communication to the trial judge that the testimony of Mrs. Silberman was being considered by them as to whether same was such corroboration. We think it was sufficiently shown in her transcribed notes that a conversation took place between the appellant and Kelly, and it appears to us that such conversation was of sufficient cogency to tend to connect appellant with the acceptance of this offered bribe; that his possession immediately thereafter of this marked two hundred and fifty $20.00 bills at the time of his arrest, would further tend to connect him with having received such funds under the circumstances not only detailed by Kelly but also shown to some extent by his transcribed statement at the time of the transaction itself.

At the risk of unduly extending this opinion, we here incorporate the transcribed statement of the conversation between appellant and Kelly offered in evidence without objection, and later called for by the jury:

"Midland, Texas, March 12, 1940.

"Conversation—R. J. Kelly office—11:30 A. M.

"Kelly: Yes - yes - yes —Tell him to come in. Hello Mr. Bigham.

"Bigham: Good morning, sir, how are you?

"Kelly: How are you?

"Bigham: Okey dokey.

"Kelly: Have a seat.

"Bigham: I haven't got but a minute, I've got—

"Kelly: O. K.

"Bigham: Go to Austin.

"Kelly: Well, I tell you I have that money here and want, I want to be sure that I am protected in this thing. I just want to know—I am going to feel sure about—

"Bigham: The only thing about it I could not guarantee not to be an earthquake or cyclone—the way it is you are perfectly safe, that's all.

"Kelly: In a way, how would those allowables be changed if they were changed.

"Bigham: Well, they would be cut down a good deal more than half.

"Kelly: Well, what would cause them to be changed?

"Bigham: Nothing in the world except just that-er State wide or something like that—there is not anything in the world to worry about unless somebody goes out there and retests your wells in that case you would have about 87 bbls in place of—622, that is on potential allowables.

"Kelly: The only way they would be changed would be by you having them tested.

"Bigham: That's it—of course, the Austin office—nobody else—they want them retested—and they are going to refer it to me and if we retest them you still would not be affected. That is what I am trying to tell you (Train whistle).

"Kelly: I am just wondering if we couldn't pay you $1,000.00 and $1,000.00 per month.

"Bigham: Well, I don't believe that's satisfactory the way they talked in Austin. The damn thing has been rocking along— that they know of—since the 10th of last November—that they got positive proof of.

"Kelly: Then they have positive proof in Austin.

"Bigham: Yeah - - - that's right cause here's the idea with me. In other words they just as well make what they are set on schedule at. And what if you were cut back? I figured it up the other day to be about 12,000 barrels a month instead of having twenty some odd thousand you would have about twelve I mean about eight thousand and then there's the from November 10th of last year—well, there's about 80% of them, you would have about twenty-eight thousand seven hundred and some odd barrels charged back against you.—I would be willing to do anything but I am just one of eight.

"Kelly: One of eight.

"Bigham: I got to do what the rest of them tell me to do.

"Kelly: You have to do what they tell you to do.

"Bigham: That's it. Now, of course, understand the Commission do not have a damn thing in the world to do with it—that is I say they haven't—the man that gives me orders is pretty close to the Commission. In other words, Jerry Saddler, Ernest Thompson and Lon Smith do not know a damn thing about it. If there ever should be anything done about it, it'll be referred to this office. They don't send a bunch of men in here to check on my leases at all. Off the record, I've had—since I have been here—25 or 30 but they would always be referred to here. I'll tell you what they ever one said - - - -

"Kelly: In other words you are in charge of this West Texas district entirely and it's up to you.

"Bigham: That's right they instruct me satisfy myself and they are tickled to death, that's what they tell me. You haven't got a thing in the world to worry about.

"Kelly: Well, I've never been in anything like this before - - -

"Bigham: If you've operated in East Texas - - -

"Kelly: I just hate to put out $5,000.00 and then God Damn next month be cut back.

"Bigham: Well, there won't be anything like that—in other words, if you got cut back to nothing you still would not lose anything because there are 28,000 damn barrels that I could charge you back but I am the only son of a bitch in the world who can do that so you are absolutely safe. Cause they are not going to—they can't do anything. If you do not mention it, well that's all there is to it cause you know damn well I am not going to say anything and if you do you would be hurt a damn sight worse than I would. Just as long as you keep quiet—now, the other man—this is off the record—I, he made a statement himself over there—he made a deal yesterday and it cost him a damn sight more than it did you.

"Kelly: Ennisbrook made a deal yesterday and it cost them.

"Bigham: Yeah, that's what I understand—the fact of the business is the man told me to stay off of it but you keep that to yourself. There is not but one damn thing in this kind of business and that's to keep your mouth shut. As long as you keep your mouth shut you are in the clear.

- - - -

I'd say 97% of the independent operators in East Texas are doing it every month but you fellows are as lucky as hell out there that something didn't happen to you for overproduction and that's the damn truth. Of course, that, of course, we—it's kind of incidental that we got hold of you. We knew the 12 wells you had out there before on that one lease wouldn't make but about 800 bbls. which is your allowable and they've been in

since the first of the year and some of them during the month and that's what I am telling you. As long as you've got it coming, well all right. If anything happens, well, I'll damn sure stand oenind it—I guarantee you that.

"Kelly: Well, I'd like for you to count that out to be sure.

"Bigham: No, you just leave it in there, hell I don't want to fool with it in here.

"Kelly: You don't want to fool with it.

"Bigham: If there is anything wrong with it I will let you know.

"Kelly: Well, there aint nothing wrong with it there are two hundred and fifty $20.00 bills.

"Bigham: If anything happens you get in touch with me and you'll get your damn money back.

"Kelly: You've got the money now it's up to you to see that we

"Bigham: There is not but one damn thing I want you to do and who ever is with you and that is keep quiet and not ever mention it—I do not give a damn who comes around you do not know a damn thing about it. Of course, if this is the first time you ever did it I understand that.

"Kelly: Yet, this is the first time I've ever done anything like this—God damn I'm just a country boy, see.

"Bigham: If you ever operated over there in East Texas, hell we made them jump right quick.

"Kelly: Yeah.

"Bigham: And they are no three or four days doing it, well I'll see you, Mr. Kelly.

"Kelly: O. K."

We think the statement itself strongly tends to connect this appellant with the acceptance of a bribe.

We have carefully reviewed this matter under the assistance of appellant's comprehensive brief as well as one of like character by the State and are impressed with the conviction that no error is shown in this trial.

The judgment is therefore affirmed.

ON MOTION FOR REHEARING.

KRUEGER, Judge.

Appellant has filed a very comprehensive motion for a rehearing presenting his contention in an able and logical manner in which he strenuously insists that there is not any evidence, direct or circumstantial, corroborating the accomplice witness, J. R. Kelly, as to material and essential facts constituting the

offense charged. It will be noted from the original opinion herein that the State made a complete case against appellant by the testimony of Kelly. Therefore, if there is any other evidence, either direct or circumstantial, which tends to connect appellant with the offense charged, then the measure of proof required by law has been met by the State. Let us see if there is any evidence which tends to identify appellant as the man who was in Kelly's office at the time in question and received from Kelly two hundred and fifty $20.00 bills. The uncontroverted evidence shows that appellant was, by the Railroad Commission, appointed supervisor of the oil fields in that area of the State; that his duties were to check the potential production as well as the amount of oil actually produced by each well in that area and make a report thereof to the Commission. Mrs. Silberman testified that on the morning in question, she had occasion to take down a conversation which occurred between Mr. Kelly and a man who answered to the name of Bigham in Mr. Oles' office, which is one office removed from that of Kelly; that she listened to the conversation with ear 'phones; that she heard what was said in the other room; that she took down the conversation in shorthand and later transcribed her notes with a typewriter; that she had a copy thereof and it was correct. She did not know the appellant but assumed that it was he because the young man who answered the door said, "Good morning, Mr. Bigham," and the person so addressed replied, "Good morning." If it had been anyone else she guessed he would have said, "This is not Bigham." Here we have a man coming to the door leading into Kelly's office. He is addressed as Bigham and no denial was made by him that such was his name. Does this tend to show that it was Bigham who came to visit Kelly at the latter's office? We think so. This, however, is not the only fact which tends to identify him and connect him with the offense. Bearing in mind that appellant was appointed by the Railroad Commission as supervisor of crude oil production for that area of the State, we find from the conversation at the time in question that they discussed the oil that had been and was being produced by the Shasta Oil Company at Midland, Texas, of which Kelly was in charge. During the discussion Kelly inquired, "How much would the allowable be changed if they were changed?" The other person replied, "They would be cut down a good deal, more than half." The conversation further shows that Kelly inquired as to what would cause the change. The reply was:

"Nothing in the world unless some one goes out there and retests the wells. * * * No one would want them retested but

the Austin office and they (meaning the Railroad Commission) would refer it to me. * * * I am in charge of this West Texas district, and it's up to me to satisfy myself."

Then Kelly asked if he could pay him $1,000.00 then and $1,000.00 per month, stating that he disliked to pay out $5,000.00 and then the next month be cut back. This was not acceptable to the party who was talking to Kelly. Finally Kelly said, "Here are two hundred and fifty $20.00 bills. Count it out to be sure." The reply was:

"No, just leave it there. I do not want to fool with it in here. If there is anything wrong with it, I will let you know. If anything happens, you get in touch with me and you will get your money back."

We have purposely refrained from setting out the entire conversation because it appears in full in our original opinion, but enough of it is stated to warrant the conclusion that the person who was talking to Kelly was the person who checked the production of the oil wells in that area of Texas, and saw to it that the wells were not producing more than that provided by the proration order of the Railroad Commission. Who was this man? Bigham. Consequently, the appellant's identity as the man who was in Kelly's office and the man who received from Kelly $5,000.00 in twenty-dollar bills as a bribe not to cut the production of the oil wells of the Shasta Oil Company is sufficient to corroborate the testimony of Kelly. Corroboration, to be sufficient, need only be as to some matter that legally tends to show appellant's guilt. The corroborating evidence may be circumstantial as well as direct. See Minor v. State, 299 S. W. 422, 108 Texas Cr. R. 1; McCue v. State, 75 Texas. Cr. R. 137, 170 S. W. 280.

We have given the motion for rehearing and every contention urged therein our most careful consideration but see no reason for receding from our conclusion as expressed in our original opinion.

The motion for a rehearing is overruled.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.